# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| MARK ABSHIRE, ET AL. | CIVIL ACTION NO. 18–0205 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| RICKEY BOUDREAUX, ET AL. | MAGISTRATE JUDGE WHITEHURST |

## MEMORANDUM RULING

Before the Court is a Motion to Dismiss filed by one of the defendants in the above-captioned matter, the Lafayette Parish School Board ("the Board"). See Record Document 7. The Board contends that Plaintiff Mark Abshire's ("Abshire")[1] complaint fails to state any claim upon which relief can be granted. See id. For the reasons which follow, the Motion to Dismiss is **DENIED**.

## BACKGROUND

The factual allegations contained in the complaint are accepted as true and are as follows.[2] T.A. attends high school in Youngsville, Louisiana, which is within the Lafayette Parish School District. Pursuant to an Intergovernmental Agreement for School Resource Officer ("SRO") services entered into between the Board and the City of Youngsville, Officer Richard Vincent ("Officer Vincent"), alleged by Abshire to be an employee of the City of Youngsville and/or the Youngsville Police Department, was assigned to T.A.'s school as its SRO. See Record Document 1. Abshire alleges that in October of 2017, an

---

[1] Mark Abshire filed suit on behalf of his minor son, "T.A." See Record Document 1.

[2] "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007).

instructor at the school directed T.A. to leave class for being loud.  Once in the hallway, the teacher called Officer Vincent, who escorted T.A. to the office.  When they arrived at the office, T.A. began to speak to a school official to explain what occurred, but Officer Vincent told T.A. to shut up and "suddenly and without warning slapped him acorss [sic] the face." Id. at 4 ¶ 10.  On November 2, 2017, the same teacher directed T.A. to leave class and go to a "common area outside of the classroom known as the 'neighborhood' to complete his work."  Id. at 4 ¶ 13.  Officer Vincent arrived in the area a short while later and "slapped T.A. in the face several times and instructed him 'do your work.'"  Id.  Later that same day, a different teacher called for Officer Vincent over the intercom.  While T.A. was seated in the classroom, Officer Vincent entered and instructed T.A. to leave.  As T.A. was gathering his things, Officer Vincent told him to "come" and "quit being slow."  Id. at 4-5 ¶ 14.  Abshire asserts that "suddenly and without warning Officer Vincent picked T.A. off the ground by his book sack and removed him from the classroom."  Id.

Abshire alleges that the "force used by Richard Vincent was excessive under the circumstances and was carried out maliciously and sadisticly [sic] in violation of T.A.'s civil rights."  Id. at 5 ¶ 16.  He further contends that it "is a common pattern, practice and custom for Lafayette School Board staff to call SRO's to respond and intervene in matters that do not involve and [sic] criminal activity or alleged criminal activity," that it "is a common pattern, practice and custom for Lafayette Parish School Board staff to call SRO's to respond and enforce school policy," and that it "is a common pattern, practice and custom for Lafayette Parish School Board staff to utilize SRO's to inflict corporal punishment on students as a means of marinating [sic] order in direct contradiction to its written policy."  Id. at 7 ¶¶ 23-25.  Abshire also asserts that the agreement providing for

SROs "fails to provide adequate guidance or restrictions regarding use of force by SRO's against schoolchildren." Id. at ¶ 26. He further contends that the agreement "does not provide guidance on appropriate detention; on appropriate uses of force for children in school settings, or on methods of de-escalation prior to using force on children." Id.

Abshire filed suit arising out of alleged violations of T.A.'s civil rights, specifically the use of excessive force in violation of the Fourth Amendment. See Record Documents 1, 18 and 34. He also asserts claims of battery and intentional infliction of emotional distress. See id. Relevant to the instant motion, he asserts a claim for municipal liability and failure to investigate, train or supervise against the Board. He sued Chief Rickey Boudreaux of the Youngsville Police Department, in his official and individual capacities, the City of Youngsville, the Board, Officer Richard Vincent, in his official and individual capacities, and the City of Youngsville's insurer, Atlantic Specialty Insurance Company.[3] See id. The Board has now moved to dismiss all of Abshire's claims against it.[4] See Record Document 7. Abshire filed an opposition and the Board filed a reply. See Record Documents 14 and 23.

---

[3] These defendants have also filed a Motion to Dismiss, which is addressed in a separate ruling. See Record Document 11.

[4] In his Second Amended Complaint, Abshire added claims against Chief Boudreaux in his individual capacity. See Record Document 34. Thereafter, in light of the amended complaint, the Court allowed the parties to supplement their briefing to address any additional claims asserted. Despite the fact that the additions to the Second Amended Complaint had nothing to do with claims against the Board, the Board chose to file a supplemental brief, addressing the Second Amended Complaint. See Record Document 38.

## LAW AND ANALYSIS

**I.      Pleading Standards And The Rule 12(b)(6) Standard.**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The standard for the adequacy of complaints under Rule 8(a)(2) is now a "plausibility" standard found in Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), and its progeny.  Under this standard, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 555-56, 127 S. Ct. at 1965 (citations omitted).  If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2).  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

Federal Rule of Civil Procedure 12(b)(6) allows parties to seek dismissal of a pleading for failure to state a claim upon which relief may be granted.  In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings."  Colle v. Brazos Cnty., Tex., 981 F.2d 237, 243 (5th Cir. 1993) (citation omitted).  However, a court may rely upon "documents incorporated into the complaint by reference [] and matters of which a court may take judicial notice" in deciding a motion to dismiss.  Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted); see Fed. R. Evid. 201.  Additionally, courts must accept all allegations in a complaint as true.  See Twombly, 550 U.S. at 555, 127 S. Ct. at 1965.

A motion to dismiss is "viewed with disfavor and is rarely granted." Turner v. Pleasant, 663 F.3d 770, 775 (5th Cir. 2011), quoting Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009). Dismissal is appropriate only if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974. To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." Colony Ins. Co. v. Peachtree Constr., Ltd., 647 F.3d 248, 252 (5th Cir. 2011). However, it must allege enough facts to move the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950.

## II. Section 1983/Monell Claims Against Local Governments.

Title 42, United States Code, Section 1983 provides a claim against anyone who, under color of state law, deprives another of his or her constitutional rights. In Monell v. Department of Social Services of the City of New York., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978), the Supreme Court held that Congress intended Section 1983 to apply to local government entities as well as to persons. The Monell Court further held that municipalities and local government agencies cannot be held liable for constitutional torts under Section 1983 pursuant to a theory of respondeat superior, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. Therefore, to succeed on a Monell claim against a local government entity, the plaintiff must establish (1) an official policy or custom, of which (2) a policymaker can be

charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. See Fuentes v. Nueces Cnty., Tex., 689 F. App'x 775, 777 (5th Cir. 2017), quoting Valle v. City of Hous., 613 F.3d 536, 541-42 (5th Cir. 2010). Locating an official policy or custom ensures that a local government entity will be held liable only for violations of constitutional rights that resulted from the decisions of those officials whose acts may fairly be said to be those of the government entity itself. See Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04, 117 S. Ct. 1832, 1388 (1997).

**III. Analysis.**

The Board contends that there are no facts asserted in the complaint that would plausibly support any theory of liability against it under Section 1983. The Court will address each of the Board's arguments *seriatim*.

**A. Was There An Official Policy?**

Abshire contends that the Intergovernmental Agreement entered into between the Board and the City of Youngsville constituted its official policy and required SROs to implement the Board's zero tolerance policy. See Record Document 1 at 6 ¶ 20.[5] Existence of a policy or custom may be established in primarily two ways: (1) the existence of an officially adopted policy, regulation, or decision promulgated by individuals with policymaking authority; or (2) "a persistent, widespread practice of [] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." Harris

---

[5]The Board does not contest that it was the policymaker as it relates to the Intergovernmental Agreement. See Record Document 7 at 7 n. 28.

v. Jackson Cnty. Miss., 684 F. App'x 459, 463 (5th Cir. 2017), quoting Piotrowski v. City of Hous., 237 F.3d 567, 579 (5th Cir. 2001). A "customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." Zarnow v. City of Wichita Falls, Tex., 614 F.3d 161, 169 (5th Cir. 2010), citing Webster v. City of Hous., 735 F.2d 838, 842 (5th Cir. 1984) (en banc).

Abshire references the Intergovernmental Agreement throughout his complaint and, thus, this Court may rely upon it in deciding the instant motion to dismiss. See Dorsey, 540 F.3d at 338. The Intergovernmental Agreement specifically states:

> WHEREAS, due to various issues associated with juvenile victimization and delinquency in the community and the Lafayette Parish public schools, interaction and supervision of the students on a daily basis is necessary; and
>
> WHEREAS, as a result of these issues, the School Board has instituted the School Resource Officer's Program (herein referred to as "SRO Program"), which has been adopted by the Youngsville Police Department, a Department of the CITY OF YOUNGSVILLE, to assist the school system with the zero tolerance program[6]. . . .

Record Document 7, Ex. 1 at 1. The Intergovernmental Agreement further provides:

---

[6]According to Abshire's complaint, the zero tolerance policy

outlines violent and endangering behavior to include many non-violent, non-physical, non-dangerous activities such as: name calling; taking others' property; grabbing others' items, such as book bags, and refusing to let go; taunting; chasing; keeping a student from joining group activities; drawing offensive pictures; making offensive gestures; taking food off other students' trays in the cafeteria without permission; bus behavior that includes forcing another student into or out of a particular seat; refusing to sit beside a student or making offensive comments or gestures).

Record Document 1 at 6 ¶ 21 (emphasis and errors in original).

> SRO's DUTIES AND RESPONSIBILITIES: The SROs[7] shall have the following responsibilities and duties:
>
> . . .
>
> E. Violations: The SROs shall not enforce School Board policies and shall report any violations of any School Board policy to the school principal or his/her designee.
>
> . . .
>
> I. Discipline/Investigation: The SROs shall not act as school disciplinarians, as disciplining students is a school responsibility, SROs shall investigate all assigned cases involving school or school-complex students either involved as a victim or suspect, except for those cases handled by other specialized units. In the event that a specialized unit is required, the SROs shall assist in the investigation.

Id., Ex. 1 at 3-4.

Based upon these latter provisions, the Board argues that the Intergovernmental Agreement "on its face . . . clearly establishes that SROs *shall not* enforce Board policies or act as disciplinarians" and concludes that "Abshire cannot show that the Board officially adopted a policy which required SROs to implement its zero tolerance policy or discipline students." Record Document 7 at 7 (emphasis in original).[8] However, this Court does not agree. Considering Abshire's complaint as a whole, Abshire has plausibly alleged facts which suggest, but do not prove, that the Board may have legal liability. Abshire has alleged that the Intergovernmental Agreement constituted the official policy of the Board and required SROs to implement the Board's zero tolerance policy. He has provided fair

---

[7]The language of the Intergovernmental Agreement vacillates between referring to the school resource officers as SROs and SRO's.

[8]This is the entirety of the Board's argument as to this policy issue in its motion to dismiss.

notice to the Board of the nature of his claim and the grounds on which it rests. See Twombly, 550 U.S. at 555 n.3, 127 S. Ct. at 1965 n.3. At this stage of pleading, Abshire need only sufficiently inform the Board of the nature of his claim and persuade this Court that his complaint states a plausible claim for relief. He has done so. Whether or not he is able to muster evidence of the actual existence of such a policy or custom is a hurdle he will have to clear should the Board move for summary judgment. The Court's duty is to "determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." Thompson v. City of Waco, Tex., 764 F.3d 500, 503 (5th Cir. 2014) (quotations and citation omitted).[9]

### B. Was There A Custom?

In order to establish the existence of a custom, a plaintiff must show "[a] persistent, widespread practice of city officials or employees, which, although not authorized by

---

[9]The Board devoted almost four pages of its reply brief to an argument that it failed to make in its initial motion to dismiss–that Abshire relies on a policy (the zero tolerance policy) that no longer exists. See Record Document 23 at 1-4. Not only did the Board not make this argument in its original motion to dismiss, it further attempted to shift the blame for this failure to Abshire by stating that "Abshire neglected to disclose to the Court that the 'zero tolerance policy' he alleges that the Board admitted to having in place, was repealed by the Board nearly seven (7) years before the incident at issue allegedly occurred." Record Document 23 at 2. It was the Board who neglected to mention this in its motion to dismiss and is now attempting to make an argument in its reply brief that it clearly failed to mention.

Furthermore, this Court ordinarily does not consider arguments raised for the first time in a reply brief. See James v. MRC Receivables Corp., No. 16-0448, 2018 WL 3213147, at *7 n.4 (W.D. La. June 28, 2018) ("[T]he Court will not address this argument since it was raised for the first time in [the party's] reply memorandum."); Weems v. Hodnett, No. 10-1452, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011) ("[A]rguments raised for the first time in a Reply brief are waived."), quoting Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010). Additionally, the Court notes that this new argument regarding repeal of the zero tolerance policy only further serves to illustrate that Abshire's claims as to an official policy cannot be dismissed at this stage of the pleadings. The Board is, however, free to re-urge this argument at the summary judgment stage.

officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." Webster v. City of Hous., 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Abshire alleges an unofficial custom by the Board by asserting "that it is a common pattern, practice, and custom for [the Board's] staff to call SROs to respond" to matters that do not involve criminal activity, to enforce school policy, and the "inflict corporal punishment on students." Record Document 1 at 7 ¶¶ 23-25. Abshire is thus attempting to advance the argument that there was persistent, widespread practice of using SROs inappropriately, which, although not authorized by officially adopted and promulgated policy, was so common and well settled as to constitute a custom that fairly represented municipal policy.[10]

The Court must not convert the plausibility requirement into an analysis of whether Abshire is likely to succeed on the merits. See Twombly, 550 U.S. at 556, 127 S.Ct. at 1965 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

---

[10]The Board did not make any substantive legal argument regarding whether or not the Board had a policy that was the moving force behind the alleged violation of T.A.'s rights, instead choosing to rely upon the assertion that Abshire failed to establish an official or unofficial policy or custom. See Record Document 7 at 9 ("Because Abshire has failed to establish an official or unofficial policy or custom, he has also failed to show that there was a Board policy that was the moving force behind Officer Vincent's alleged violations of T.A.[] Fourth Amendment rights.") The Board also failed to make any legal arguments regarding actual or constructive knowledge, instead summarily concluding that "Abshire cannot demonstrate that the Board was the policy maker with respect to any alleged custom because no facts establish that the Board had knowledge of the alleged incidents between T.A. and Officer Vincent." Id. at 8. The Board's other legal "argument" as to these claims is its conclusion that "Abshire's Complaint fails to allege sufficient facts to establish all three (3) elements" of showing an official school board policy, practice or custom. Id. at 6. Conclusory, one-sentence assertions do not suffice as argument sufficient to prevail in a motion.

unlikely.")(citations omitted). Although admittedly a close call, Abshire has provided more than a boilerplate recitation of the grounds for municipal liability and has made, albeit scant, some additional allegations to put the Board on fair notice of the grounds for which it is being sued. At this stage, Abshire is only required to plead a plausible cause of action. While he may not ultimately prevail, he has alleged enough factual content to nudge his claims "across the line from conceivable to plausible." Iqbal, 556 U.S. at 680, 129 S. Ct. at 1950-51, quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1974.

### C. Failure To Train, Supervise And/Or Discipline.

In its motion to dismiss, the Board attacks Abshire's complaint for failing to state a claim for failure to train, supervise and/or discipline Officer Vincent by solely arguing that Officer Vincent is not an employee of the Board. The Board contends that it "is well established that a municipality may be liable only under certain limited circumstances for failure to train, supervise and/or discipline *its employees*." Record Document 7 at 9 (emphasis in original). Notably, in support of this "well established" argument, the Board cites to a case from the Southern District of Texas and a case from the Sixth Circuit Court of Appeals. See id. at n.39. This is the entirety of the Board's legal argument as to this issue.

The Board accurately notes that Abshire alleges in his complaint that Officer Vincent was an employee of the Youngsville Police Department or the City of Youngsville. See Record Document 1 at 2-3 and 5 ¶¶ 4, 7 and 17. The Board further points out, in a footnote, that the Intergovernmental Agreement provides that "SROs are the employees of the City of Youngsville." Record Document 7, Ex. 1 at 2. However, the Board fails to

mention that the Intergovernmental Agreement also states that a portion of the SRO salary will be paid for by the Board. See id. ("WHEREAS, the School Board has agreed to assist the CITY OF YOUNGSVILLE with the salary of each SRO."). In addition, the Intergovernmental Agreement provides that the Board will pay fifty percent of costs associated with SRO training. See id. Relying upon this, and other, provisions in the Intergovernmental Agreement, Abshire contends that Officer Vincent was "receiving compensation, instructions and directions regarding various assignments from the co-policy makers, the Lafayette Parish School Board and Rickey Boudreaux, Chief of Police for the City of Youngsville." Record Document 14 at 6-7. Finally, Abshire counters that "[w]hether Officer Vincent is an employee of the Board, the City of Youngsville or a joint employee of both municipal entities is a question of law which should not be addressed in a Motion to Dismiss under Rule 12(b)(6)." Id. This Court agrees.

Similar to the previous claims, this Court is hesitant to dismiss a claim at this stage of pleading, especially considering the scant legal argument that was made by the Board in support of its position. While there is not as much factual detail set forth in Abshire's complaint as might be ideal, his allegations, in combination with the language of the Intergovernmental Agreement, are sufficient to state a plausible claim against the Board as Officer Vincent's employer. Abshire's complaint meets Rule 8's requirement of a short and plain statement of the claim. A complaint may proceed even if "recovery is very

remote and unlikely," so long as the alleged facts "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56, 127 S. Ct. at 1965 (citation omitted). Abshire has met this standard.

## CONCLUSION

Based on the foregoing analysis, the Motion to Dismiss filed by the Board is **DENIED**.[11]

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 26th day of October, 2018.

```
_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT
```

---

[11] Abshire has requested "only in the alternative, if the Court believes that Mr. Abshire's allegations underlying his municipal-liability claim are not sufficiently particularized, the Court should not dismiss that claim but rather should first give Mr. Abshire an opportunity to conduct discovery and amend his pleadings." Record Document 14 at 9. As this Court has not dismissed Abshire's claims pursuant to the instant motion, this request is **MOOT**.